UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| URIEL RAMIREZ<br><br>                                    Petitioner,<br><br>v.<br><br>CHRISTIAN PFEIFFER, Warden, et al.,<br><br>                                    Respondents. | Case No.:  18cv2368 CAB (LL)<br><br>**ORDER: (1) DENYING HABEAS CORPUS PETITION; and (2) DENYING CERTIFICATE OF APPEALABILITY** |

I.     <u>INTRODUCTION</u>

Petitioner Uriel Ramirez, a state prisoner proceeding with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition" or "Pet."), challenges his convictions for kidnapping during a carjacking and evading a peace officer, as well as true findings on firearm use and gang enhancements.  The Court has read and considered the Petition [ECF No. 1], the Answer and Memorandum of Points and Authorities in Support of the Answer [ECF Nos. 11, 11-1], the lodgments and other documents filed in this case, and the legal arguments presented by both parties.[1]  For the reasons discussed below, the Court **DENIES** the Petition.

---

[1] Page numbers for docketed materials cited in this Order refer to those imprinted by the court's electronic case filing system.

## II.   **FACTUAL BACKGROUND**

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The state appellate recounted the facts as follows:

> At about 10:00 a.m. on September 1, 2014, 17-year-old J.A. was sitting in his 2003 Honda Accord in the parking lot of the Buena Creek Transit Center in Vista waiting for his girlfriend. J.A. saw a male, later identified as defendant, milling around the parking lot. Defendant was wearing black or blue shorts, a blue shirt, long knee socks, and football gloves. He drew J.A.'s attention because this is the type of clothing "somebody with gang affiliation wears." J.A. knew this because, although he was not a gang member, he grew up around people he "thought were involved in gangs."

> As J.A. opened his car door to stretch, defendant approached and asked for a ride. J.A. responded, "No, I can't." Defendant replied, "It's fine," and began walking away. J.A. returned to what he was doing.

> About five seconds later, defendant returned and angrily told J.A. to give him the car. Defendant appeared to be high on drugs. He had one hand under his long t-shirt, near his waistband; J.A. could see "an outline of what looked like a rectangle." Defendant told J.A. that if he did not give him the car, he would kill him. J.A., who had worked hard to save up money to buy the car, said no. Defendant pulled a black handgun from under his shirt, pointed it at J.A.'s head, and said, "'Do you know where you are? This is my hood.'" J.A. construed this as a threat that he was "in the wrong part of town." Defendant again angrily demanded J.A.'s car. Not wanting to lose his car, and fearful that defendant would "shoot [him] right there" in the parking lot even if he surrendered it, J.A. instead offered to give defendant a ride. Defendant declined. J.A. said, "Come on. Just let me give you a ride." J.A. was scared and shaking. Defendant agreed and walked around the front of the car, concealing the handgun under his shirt. J.A. thought about trying to escape, but "didn't want to get shot at." Defendant got in the front passenger seat, placed the gun on his lap, and pointed it at J.A's chest. J.A. asked, "Where to?" Defendant responded, "Just drive." J.A. drove the car

out of the parking lot and headed north. J.A.'s girlfriend arrived in time to see them drive off, which struck her as unusual.

As they drove, defendant told J.A., "I'm from San Marcos." J.A. understood this to mean that defendant "represents" San Marcos or claims it as his "hood," not merely that "Oh, that's where he lived." J.A. observed that defendant had "San Marcos" tattooed on his upper lip, and the letter "E" tattooed on his neck. Defendant said his name was "Shadow" (or something similar), that he was "on the run," and that "they" were searching his apartment. As J.A. drove, defendant played with the gun, ejecting the magazine. J.A. could see the bullets. Defendant warned, "I still have one in the chamber. I could kill you now." J.A. did not try to get anyone's attention because he was afraid of being shot.

After about eight minutes of driving on a main street (Santa Fe Road), Defendant told J.A. to turn onto a residential side street (Nevada Street). J.A. refused, afraid defendant might be "tak[ing] [him] somewhere worse," in "that he could have other, like, friends there." J.A. offered to drop off defendant, and, with the gun still pointed at him, pulled to the curb and stopped. Defendant responded, "I'm taking the car then." J.A. acquiesced. As J.A. exited the car, defendant leaned over, pushed J.A. out, and drove off heading north. J.A., still afraid that defendant might shoot him, ran south. About two minutes later, J.A. saw defendant drive by fast, roll down the window and point his gun at J.A.

A college student who saw the car driving erratically and saw J.A. running followed J.A. to offer assistance. The student caught up with J.A. and gave him a ride back to the transit center. J.A., shaking and trembling, told the student what had happened. J.A. called 911, and a recording of his call was played for the jury. Later that day, J.A. selected defendant's photo in a six-pack photo array.

In the meantime, defendant led law enforcement on a high-speed chase that involved a helicopter and a canine unit. [FN 2: Defendant conceded the reckless evasion count at trial and does not challenge it on appeal. We therefore discuss it only as it relates to his appellate claims on other counts.] After crashing J.A.'s car, defendant fled on foot and sent a text message to Jorge Adame asking to pick him up. Adame picked up defendant and dropped him off at a girl's house. [FN 3 omitted.]

///

The next day, law enforcement had defendant under surveillance at a restaurant in Oceanside. An FBI agent assigned to the North County Regional Gang Task Force walked past defendant to confirm his identity. As he did, the agent heard defendant "telling [a] story to [another] Hispanic male," explaining he was "running," "[t]hey were everywhere," and the "bird was up." As he talked, defendant made a gesture with his hands as if he were holding a gun. Defendant was arrested without incident. Law enforcement did not recover a gun from defendant or J.A.'s car.

Investigators collected forensic evidence. Security camera footage showed defendant was in the transit center parking lot the morning of September 1. Text messages from around that day were extracted from defendant's cell phone. In one message, defendant referred to himself as "Grims" and requested a ride. Outgoing texts from later that evening read: "Just got away 4-R-M [from] the cops," "I almost got busted today," and "today I thought I would neva get to see you again. Honestly I was feeling hella down when the ghetto bird was on me."

Detective Jeff Creighton of the San Diego Sheriff's Department testified at trial as the prosecution's gang expert. He testified defendant was a member of Varrio San Marcos (VSM), one of the two main Hispanic street gangs in San Marcos. When asked a hypothetical question based on facts mirroring the evidence elicited in the prosecution's case, Detective Creighton opined that the hypothetical actor's conduct would benefit and promote the VSM gang. We discuss Detective Creighton's testimony in more detail in part III, post.

*The Defense Case*

Defendant was the sole defense witness. He had been "interested and attracted to the gang lifestyle" since elementary school, and admitting to joining VSM when he was 18 or 19. He was 22 at the time of the offense and had been released from custody just two weeks earlier. [FN 4 omitted.]

On September 1, defendant was at the transit center returning to his aunt's house after having spent the night with an ex-girlfriend. He had been smoking marijuana when he saw J.A. pull into the parking lot. Defendant thought he knew J.A., so he approached. When defendant got close enough to J.A.'s open car door to realize he did not know J.A., defendant said, "My bad. I thought you were one of my friends." J.A., who did not know defendant, then said, "Dude, you're fucking high," and asked, "Where's it

at?", which defendant characterized as "a slang term that, like, he wanted some bud." Defendant had marijuana in his possession, but did not want to come across to J.A. as the type of person who sells marijuana. Therefore, he told J.A. he did not have any, but had a friend who lived nearby who would sell him some. Defendant planned to ultimately sell J.A. the marijuana himself. J.A. then offered defendant a ride to the friend's house to conduct the transaction. Defendant got in J.A.'s car "[v]oluntarily," and they drove north. Defendant insisted he was not carrying a gun, and didn't even own one around that time.

As they drove, defendant "pretty much introduced [him]self, like [he] always [does] to people." He said he was from San Marcos, which was "obvious [ ]" because of the "label on [his] face." And although his real gang moniker is "Grims," he told J.A. he goes by "Stranger." J.A. told defendant he wanted to purchase "an eighth" of marijuana for $40. Defendant directed J.A. to pull over near Nevada Street, and asked for the money. When J.A. stopped the car and handed defendant the money, defendant "just grabbed it and . . . ran out." J.A. exclaimed, "What the fuck?", and chased defendant on foot.

Defendant – being "a very athletic person" – outran J.A., circled back to J.A.'s idling car, and drove it away. Defendant admitted he led law enforcement on a high-speed chase in the manner described by the prosecution witness. He also admitted he sent a text message while fleeing, asking to be picked up. He was picked up by two VSM members, and told them what had happened. He was arrested the following day.

(Lodgment No. 1, ECF No. 12-1 at 2-7.)

## III.   PROCEDURAL BACKGROUND

On November 13, 2014, the San Diego District Attorney's Office filed a three-count information charging Uriel Alejandro Ramirez with one count of carjacking, a violation of California Penal Code § 215(a) (count one), one count of kidnaping during a carjacking, a violation of California Penal Code § 209.5(a) (count two), and one count of evading a peace officer with reckless driving, a violation of California Vehicle Code § 2800.2(a) (count three). (Lodgment No. 9, ECF No. 12-16 at 19-22.) As to counts one and two, the information alleged that Ramirez personally used a firearm, within the meaning of California Penal Code § 12022.53(b), and committed the offense for the

benefit of a street gang with the intent to promote the gang, within the meaning of California Penal Code §§ 186.22(b)(4) (count one) and 186.22(b)(5) (count two). (*Id.*) Finally, the information alleged Ramirez had suffered three prior convictions which made him ineligible for probation, within the meaning of California Penal Code § 1203(e)(4), two prior convictions for which he had served a prison sentence, within the meaning of California Penal Code §§ 667.5(b) and 668, a prior serious felony conviction, within the meaning of California Penal Code §§ 667(a)(1), 668, and 1192.7(c), and a prior "strike" conviction, within the meaning of California Penal Code §§ 667(b) through (i), 1170.12, and 668. (*Id.*)

Following a jury trial, Ramirez was convicted of counts two and three (count one was a lesser offense to count two); the jury also found the firearm and gang enhancements to be true for count two, kidnapping during a carjacking. (*Id.* at 126, 139-42.) Ramirez was sentenced to thirty years-to-life plus twenty-two years. (*Id.* at 186-88.)

Ramirez appealed his conviction to the California Court of Appeal for the Fourth Appellate District. (Lodgment Nos. 4-6, ECF Nos. 12-4 – 12-6.) The state appellate court upheld Ramirez's conviction in a written opinion. (Lodgment No. 1, ECF No. 12-1.) Ramirez then filed a petition for review in the California Supreme Court. (Lodgment No. 7, ECF No. 12-7.) The California Supreme Court summarily denied the petition. (Lodgment No. 3, ECF No. 12-3.)

Ramirez filed a Petition for Writ of Habeas Corpus in this Court on October 15, 2018. (ECF No. 1.) Respondent filed an Answer and Memorandum of Points and Authorities in Support of Answer on March 7, 2019. (ECF Nos. 11, 11-1.) Ramirez did not file a Traverse.

## IV.  **DISCUSSION**

Ramirez's Petition contains three claims. In claim one he contends that his federal due process right to a fair trial was violated when the trial judge failed to give additional jury instructions on the defense of consent. (Pet., ECF No. 1 at 6-11.) In claim two he argues trial counsel was ineffective for failing to ask for the additional jury instructions

on consent. (*Id.* at 12-14.) And in claim three he contends there was insufficient evidence presented at trial to support the gang enhancement allegation. (*Id.* at 15-19.) Respondent argues that the state court's resolution of the claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 11-1 at 11-27.)

A. *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established

federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

B. *Ground One: Jury Instructions*

In ground one, Ramirez contends the trial judge committed constitutional error when he failed to sufficiently instruct the jury on actual consent and on the defense of reasonable but mistaken consent. (Pet., ECF No. 1 at 6-11.) Ramirez raised this claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 7, ECF No. 12-7 at 9-15.) The California Supreme Court summarily denied the petition, and thus this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. *Ylst*, 501 U.S. at 805-06. That court wrote:

1. *Actual Consent*

Defendant relied on an actual consent defense and, thus, was entitled to have the jury instructed on it. (*Dominguez*, *supra*, 39 Cal.4th at p. 1148; *Andrade*, *supra*, 238 Cal.App.4th at p. 1300.) We conclude the jury was, in fact, adequately instructed in this regard. First, regarding the kidnapping during a carjacking count, the court instructed the jury via CALCRIM No. 1204 that the People were required to prove J.A. "did not consent to the

movement." This expressly informed the jury of the consent concept and indicated the People bore the burden of disproving consent. Second, in connection with the lesser-included carjacking count, the court instructed the jury on the definition of "consent" with CALCRIM No. 1650: "An act is done *against a person's will* if that person does not consent to the act. In order to *consent*, a person must act freely and voluntarily and know the nature of the act." The court also instructed the jury to "[p]ay careful attention to all of these instructions and *consider them together*." (CALCRIM No. 200, italics added; see *Dieguez*, supra, 89 Cal.App.4th at p. 276; *Sanchez*, *supra*, 26 Cal.4th at p. 852.) Considering the instructions as a whole, we conclude the jury was sufficiently instructed on the concept of actual consent. The fact the court did not also instruct the jury with CALCRIM No. 1204's bracketed paragraph – which the bench notes characterize as "[a]n optional paragraph" (italics added) – is thus of no moment. (CALCRIM No. 1204; Judicial Counsel of Cal., Crim. Jury Instns. (2016 ed.) Bench Notes to CALCRIM No. 1204, p. 956.)

Even if the trial court erred by not instructing the jury with CALCRIM No. 1204's optional language regarding actual consent, the error caused defendant no prejudice because the jury necessarily resolved the underlying factual predicate (whether J.A. accompanied defendant voluntarily or only because defendant threatened him with a gun) against defendant by making a true finding that he used a firearm during the commission of the carjacking. (See *People v. Stewart* (1976) 16 Cal.3d 133, 141 ["a failure to instruct where there is a duty to do so can be cured if it is shown that 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions'"].)

### 2. *Reasonable But Mistaken Belief in Consent*

Defendant did not rely at trial on a *Mayberry* defense of reasonable but mistaken belief in consent. Thus, he was only entitled to have the jury instructed on the theory if it was supported by substantial evidence and was consistent with his defense theory. (*Dominguez*, *supra*, 39 Cal.4th at p. 1148; *Andrade*, *supra*, 238 Cal.App.4th at p. 1300.) Defendant has not cleared these hurdles.

"The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented . . . .

In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent." (*People v. Williams* (1992) 4 Cal.4th 354, 360-361 (*Williams*), fn. omitted.)  Evidence of the defendant's state of mind may be circumstantial.  (*People v. Thomas* (2011) 52 Cal.4th 336, 355.)

"In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances.  Thus, regardless of how strongly a defendant may subjectively believe a person has consented . . . , that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*Williams*, *supra*, 4 Cal.4th at p. 361.)  "[B]ecause the *Mayberry* instruction is premised on mistake of fact, the instruction should not be given absent substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." (*Id*. at p. 362.)

In evaluating the objective component, the victim's conduct that the defendant claims "was equivocal must be viewed in the context of the circumstances surrounding the conduct he described." (*People v. Hernandez* (2009) 180 Cal.App.4th 337, 345.)  Thus, for example, in *Hernandez*, our court found it "unreasonable as a matter of law for [the defendant] to believe the victim consented to sexual intercourse" where, although defendant knew the victim from church, he broke into her home in the early hours of the morning carrying a two-foot long metal bar, told the victim he had killed a police officer, and "gave her ten minutes to give in to his demands for sex or 'something bad was going to happen.'" (*Id*. at pp. 344-345.)

Assuming without deciding that substantial evidence supports the subjective component of the *Mayberry* defense, we conclude the trial court was not required to sua sponte instruct the jury on this defense because substantial evidence does not support defendant's claim – asserted for the first time on appeal – that he reasonably relied on equivocal conduct by J.A.  That is, "viewed in the context of the circumstances" of J.A.'s offer to give defendant a ride (*Hernandez*, *supra*, 180 Cal.App.4th at p. 345), it would have been unreasonable as a matter of law for defendant to believe J.A. consented to accompany him.  J.A. was a minor and was not a gang member.  Defendant was a stranger who appeared to J.A. to be a gang member.  Indeed, he was one.  When defendant asked J.A. for a ride before pulling a gun on him, J.A. declined the request.  It was only when defendant then

threatened J.A. with the gun and demanded his car – facts the jury specifically found to be true – that J.A. then offered defendant a ride. In light of defendant pulling a gun on J.A. and threatening to kill him if he did not surrender his car – circumstances that put defendant in "fear of injury to the person or injury to the person's . . . property" (CALCRIM No. 1204) – it would have been unreasonable as a matter of law for defendant to believe J.A. consented to give him a ride.

We are mindful of the Supreme Court's "guidance" in *Williams* about exercising caution when considering a victim's post-threat conduct in evaluating purportedly equivocal conduct. (*Williams*, *supra*, 4 Cal.4th at p. 364.) [FN 7 omitted.] However, we find the guidance inapplicable here because it applies only when there is substantial evidence of objective reasonableness. That is lacking here. Moreover, we need not concern ourselves with what a hypothetical jury might believe or disbelieve. With the benefit of hindsight, we know for a fact that the jury believed J.A.'s claim that defendant personally used a firearm in the commission of the offense. In that context, defendant could not reasonably have believed J.A. consented to give him a ride.

In any event, the trial court was not obligated to sua sponte instruct the jury on the reasonable but mistaken belief in consent defense because it was inconsistent with defendant's theory of the case. (See *Dominguez*, supra, 39 Cal.4th at p. 1148 [sua sponte duty to instruct arises ""'"if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case"'""], italics added.) Defendant vigorously challenged J.A.'s credibility and declared his version of events to be unreasonable. Defendant testified in his defense and expressly asserted an actual consent defense. In doing so, he denied owning or possessing a gun, which was the impetus of J.A.'s purportedly equivocal conduct. To now claim that defendant reasonably believed J.A. consented to accompany him based on the very conduct he expressly denied occurred is wholly inconsistent with defendant's trial testimony and his trial counsel's argument to the jury.

In sum, the jury was properly instructed on the only consent theory that was supported by substantial evidence – actual consent.

(Lodgment No. 1, ECF No. 12-1 at 13-18.)

The Supreme Court has stated that "[a]s a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence

sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63, (1988) (citation omitted). The Ninth Circuit has interpreted *Mathews* as standing for the proposition that "[i]t is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case." *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000). In order to obtain federal habeas corpus relief, however, a petitioner must show that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (citing *Cupp v. Naugh'ten*, 414 U.S. 141, 146 (1973)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). "The burden on the habeas petitioner is especially heavy where, as here, the alleged error involves the failure to give an instruction." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). "Jury instructions cannot be judged in isolation, however." *Estelle*, 502 U.S. at 72. Rather, they must be considered in the context of the entire trial record and the instructions as a whole. *Id*.

Ramirez's defense at trial was that J.A. willingly drove his car, with Ramirez as a passenger, to a location where Ramirez was going to help J.A. acquire some marijuana. Ramirez testified at trial that he approached J.A. in the parking lot for the Sprinter train because he thought J.A. was a friend of his. (Lodgment No. 8 vol. 4, ECF No. 12-11 at 66.) Ramirez had just been smoking marijuana. (*Id*.) When he discovered that J.A. was not someone he knew, he apologized; J.A. then said, "Dude, you're fucking high," and asked where he could get some marijuana. (*Id*.) Ramirez told J.A. he could take him to purchase some marijuana and J.A. offered him a ride and Ramirez accepted. (*Id*. at 66-67.) During the ride, Ramirez introduced himself and told J.A. he was from San Marcos. (*Id*. at 67-68.) Ramirez directed J.A. to where the transaction was to occur, but when J.A. handed Ramirez $40.00 to purchase the marijuana, Ramirez took the money and ran away. (*Id*. at 69-71.) J.A. began to chase Ramirez and Ramirez doubled back to J.A.'s car and took it. (*Id*. at 71-72.) Ramirez testified he never had a gun. (*Id*. at 81.)

/ / /

The instructions given to the jury for the carjacking and kidnapping during a carjacking read as follows:

1650 Carjacking (Pen. Code, § 215)

The defendant is charged in Count One with carjacking in violation of Penal Code section 215.

To prove that the defendant is guilty of this crime, the People must prove that:

1.  The defendant took a motor vehicle that was not his own;

2.  The vehicle was taken from the immediate presence of a person who possessed the vehicle or was its passenger;

3.  The vehicle was taken against that person's will;

4.  The defendant used force or fear to take the vehicle or to prevent that person from resisting;

AND

5.  When the defendant used force or fear to take the vehicle, he intended to deprive the other person of possession of the vehicle either temporarily or permanently.

The defendant's intent to take the vehicle must have been formed before or during the time he used force or fear. If the defendant did not form this required intent until after using the force or fear, then he did not commit carjacking.

A person takes something when he or she gains possession of it and moves it some distance. The distance moved may be short.

*An act is done against a person's will if that person does not consent to the act. In order to consent, a person must act freely and voluntarily and know the nature of the act.*

Two or more people may possess something at the same time.

A person does not have to actually hold or touch something to possess it. It is enough if the person has control over it, either personally or through another person.

Fear, as used here, means fear of injury to the person himself or herself.

A vehicle is within a person's immediate presence if it is sufficiently within his or her control so that he or she could keep possession of it if not prevented by force or fear.

. . . .

### 1204. Kidnapping: During Carjacking
### (Pen. Code, § 209.5(a), (b))

The defendant is charged in Count Two with kidnapping during a carjacking in violation of Penal Code section 209.5.

To prove the defendant is guilty of this crime, the People must prove that:

1. The defendant committed a carjacking;

2. During the carjacking, the defendant took, held, or detained another person by using force or by instilling reasonable fear;

3. The defendant moved the other person or made that person move a substantial distance from the vicinity of the carjacking;

4. The defendant moved or caused the other person to move with the intent to facilitate the carjacking;

5. The person moved was not one of the carjackers;

   AND

6. *The other person did not consent to the movement.*

To decide whether the defendant committed carjacking, please refer to the separate instructions that I have given you on that crime.

14

As used here, substantial distance means more than a slight or trivial distance. The movement must have been more than merely brief and incidental to the commission of the carjacking. The movement must also have increased the risk of physical or psychological harm to the person beyond that necessarily present in the carjacking. In deciding whether the movement was sufficient, consider all the circumstances relating to the movement.

Fear, as used in this instruction, means fear of injury to the person or injury to the person's family or property.

(Lodgment No. 9, ECF No. 12-16 at 114-16) (italics added.)

1. *Actual Consent*

Ramirez first argues the jury instructions for the carjacking and kidnapping during a carjacking offenses were erroneous because the trial court did not include a more explicit, optional and additional instruction regarding actual consent. (Pet., ECF No. 1 at 6-11.) The Bench Notes associated with CALCRIM No. 1204 state that "[t]he court has a sua sponte duty to instruct on the defense of consent if there is sufficient evidence to support the defense. [citations omitted]. An optional paragraph is provided for this purpose." CALCRIM No. 1204, Bench Notes. The optional language reads as follows:

The defendant is not guilty of kidnapping if the other person consented to go with the defendant. *The other person consented if (he/she) (1) freely and voluntarily agreed to go with or be moved by the defendant*, (2) was aware of the movement, and (3) had sufficient maturity and understanding to choose to go with the defendant. The People have the burden of proving beyond a reasonable doubt that the other person did not consent to go with the defendant. If the People have not met this burden, you must find the defendant not guilty of this crime.

CALCRIM No. 1204 (West 2013) (italics added).

While the better practice was perhaps for the trial court to include the optional paragraph in the instructions, any error associated with a failure to do so is an issue of the proper application of state law and is not cognizable on federal habeas corpus review. *Estelle*, 502 U.S. at 67. Further, as the state court correctly concluded, the jury instructions adequately notified the jury of Ramirez's consent defense. CALCRIM No.

1650 told the jury that in order to find Ramirez guilty of kidnapping during a carjacking, they had to find, beyond a reasonable doubt, that J.A.'s car was taken against his will and without his consent. The instruction went on the define these terms, stating that "[i]n order to consent a person must act freely and voluntarily . . . ." (Lodgment No. 9, ECF No. 12-16 at 114-15 [CALCRIM No. 1650].) This language mirrors the language from the optional instruction about consent Ramirez claims the trial court should have given to the jury. (*See* CALCRIM No. 1204, optional paragraph stating "The other person consented if he/she (1) freely and voluntarily agreed to go with or be moved by the defendant.") In addition, the instructions for kidnapping during a carjacking stated the jury had to find beyond a reasonable doubt that J.A. did not consent to the movement Ramirez caused. (*See* Lodgment No. 9, ECF No. 12-16 at 97 [CALCRIM No. 220, reasonable doubt instruction], 116 [CALCRIM No. 1204, kidnapping during a carjacking instruction].) Thus, the optional language in CALCRIM No. 1204 did not add any new information to the jury instructions the jury already had before them. While the additional language provided more specific instructions about consent, the failure to include it did not "so infect[] the entire trial that the resulting conviction violates due process." *Clark*, 450 F.3d at 904 (internal citations and quotation omitted); *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996) (defendants are not entitled to any specific jury instruction so long as the instructions given adequately cover the defendant's theory of the case).

      2. *Reasonable But Mistaken Belief in Consent*

Ramirez also argues the trial court erred when it failed to instruct the jury on the defense of mistaken belief in consent. (Pet., ECF No. 1 at 6-11.) The defense of reasonable but mistaken belief is referred to as the *Mayberry* defense after a California Supreme Court case, *People v. Mayberry*, 15 Cal.3d 143 (1975). The *Mayberry* defense

/ / /

/ / /

/ / /

is more commonly raised in cases of sexual assault.  The California Supreme Court has described the defense as follows:

> The *Mayberry* defense has two components, one subjective, and one objective.  The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented . . . . [FN 6 omitted].  In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent.

> In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances.  Thus, regardless of how strongly a defendant may subjectively believe a person has consented . . . , that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction.  (See *People v. Bruce* (1989) 208 Cal.App.3d 1099, 1104, 256 Cal.Rptr. 647 [one relying on *Mayberry* defense must produce some evidence of victim's equivocal conduct that led the accused to reasonably believe there was consent]; *People v. Romero* (1985) 171 Cal.App.3d 1149, 1156, 215 Cal.Rptr. 634 ["defense must produce some evidence of equivocal conduct by the victim which led him to reasonably believe that there was consent where in fact there was none."].)

*People v. Williams*, 4 Cal. 4th 354, 360-61 (1992).

Ramirez did not present any evidence of a reasonable but mistaken belief in consent.  Ramirez did not testify that J.A.'s behavior was "equivocal" and that therefore he erroneously believed he consented to drive Ramirez somewhere.  *See Williams*, 4 Cal. 4th at 360-61.  Rather, as noted above, Ramirez testified that after J.A. asked him where he could get some marijuana, he offered to take J.A. somewhere to purchase it, J.A. offered him a ride and Ramirez accepted.  (Lodgment No. 8 vol. 4, ECF No. 12-11 at 66-67.)  Thus, Ramirez asserted only that J.A. *actually* consented to the acts necessary to satisfy the elements of the kidnapping during a carjacking conviction.  Moreover, the failure to instruct on reasonable but mistaken belief in consent did not "so infect[] the entire trial that the resulting conviction violates due process."  *Clark*, 450 F.3d at 904 (internal citations and quotation omitted.)  Even if the jury had been so instructed, the

jury would not have concluded that the objective component of the "reasonable but mistaken belief in consent" defense was satisfied. As the state court noted, the jury found that Ramirez had personally used a firearm during the commission of the kidnapping. (Lodgment No. 9, ECF No. 12-16 at 139.) The use of a gun during the incident would have precluded a finding by the jury that Ramirez's supposed reasonable but mistaken belief was "formed under circumstances society will tolerate as reasonable." *Williams*, 4 Cal. 4th at 360-61.

For the foregoing reasons, the state court's denial of Ramirez's jury instruction claim, claim one, was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Bell*, 535 U.S. at 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Ramirez is not entitled to relief as to this claim.

C. *Ground Two: Ineffective Assistance of Counsel*

Ramirez contends in claim two that his trial counsel rendered ineffective assistance when he failed to ask for the additional jury instructions on actual and reasonable but mistaken consent. (Pet., ECF No. 1 at 12-14.) Ramirez raised this claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 7, ECF No. 12-7 at 9-15.) The California Supreme Court summarily denied the petition, and thus this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. *Ylst*, 501 U.S. at 805-06. That court wrote:

> As a fallback to his sua sponte instructional duty argument, defendant contends his counsel's failure to affirmatively request additional instruction on consent theories constituted ineffective assistance. We disagree.

> To establish ineffective assistance of counsel, a defendant "must demonstrate that (1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the petitioner to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the petitioner." (*In re Neely* (1993) 6 Cal.4th 901, 908–909, citing *Strickland v. Washington*

(1984) 466 U.S. 668, 687.)  If a defendant fails to show prejudice, a reviewing court may reject the claim of ineffective assistance of counsel without determining whether counsel's performance was adequate. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1101; *Strickland*, at p. 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."].)

Defendant has not met his burden of showing prejudice.  First, although defendant relied on an actual consent defense, we concluded in part I.C.1, ante, that the jury was adequately instructed on this defense.  Thus, defendant was not prejudiced by his counsel's failure to affirmatively request additional instruction on this defense.

Second, because defendant neither relied on a reasonable but mistaken belief in consent defense nor cited substantial evidence of his objectively reasonable belief in consent, he likewise was not prejudiced by his counsel's failure to request an instruction on this defense.  Thus, his ineffective assistance of counsel challenge fails.

(Lodgment No. 1, ECF No. 12-1 at 18-19.)

The state appellate court correctly described the clearly established Supreme Court law governing ineffective assistance of counsel claims: Ramirez must show deficient performance and prejudice.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  Further, *Strickland* requires "[j]udicial scrutiny of counsel's performance . . . be highly deferential." *Id*. at 689.  There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id*. at 686-87.  The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id*. at 697. "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations omitted).  As the Supreme Court has stated, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

/ / /

Assuming counsel's decision not to request additional instructions on the defense of actual consent was deficient performance, Ramirez has not established he was prejudiced. As discussed above in section IV(B), there is no reasonable probability the outcome of Ramirez's case would have been different had counsel asked for the additional instructions on actual consent because the instructions that were given to the jury required them to determine, beyond a reasonable doubt, that J.A. had not consented to the movement required for the kidnapping charge. (Lodgment No. 9, ECF No. 12-16 at 114-16.) As to counsel's decision not to request instructions on the defense of reasonable but mistaken belief in consent, Ramirez has established neither deficient performance or prejudice. "Where counsel pursues one theory of the defense over another, counsel's lack of request for a jury instruction on the alternate theory does not constitute deficient performance." *Pensinger v. Chappell*, 787 F.3d 1014, 1031 (9th Cir. 2015) (citing *Clabourne v. Lewis*, 64 F.3d 1371, 1382-83 (9th Cir. 1995)). In Ramirez's case, counsel could have reasonably decided not to pursue the defense of reasonable but mistaken belief in consent because it would have undermined Ramirez's testimony and his actual consent defense. Moreover, Ramirez has not shown that any error by counsel in not requesting instructions for a defense of reasonable but mistaken belief in consent would have changed the outcome. As discussed above in section IV(B), the jury found that Ramirez personally used a gun during the incident, which would have precluded a finding by the jury that Ramirez's reasonable but mistaken belief was "formed under circumstances society will tolerate as reasonable." *Williams*, 4 Cal. 4th at 360-61.

The state appellate court's denial of this claim was neither contrary to, nor unreasonable application of, clearly established Supreme Court law. *Bell*, 535 U.S. at 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Ramirez is not entitled to relief as to this claim.

E. *Ground Three: Sufficiency of Evidence*

In ground three, Ramirez argues there was insufficient evidence presented to support the jury's finding that the kidnapping during a carjacking was committed for the

benefit of a gang.  (Pet., ECF No. 1 at 15-19.)  Ramirez raised this claim in the petition

for review he filed in the California Supreme Court.  (Lodgment No. 7, ECF No. 12-7 at

9-15.)  The California Supreme Court summarily denied the petition, and thus this Court

must "look through" to the state appellate court's opinion denying the claim as the basis

for its analysis.  *Ylst*, 501 U.S. at 805-06.  That court wrote:

> Substantial evidence supports the jury's true finding on the gang
> enhancement allegation.  Detective Creighton testified as an expert that a
> hypothetical crime rooted in the facts of this case would be gang-related
> because it would increase the gang's notoriety and further the purpose of
> deterring victims' cooperation with law enforcement.  (See *Albillar*, *supra*,
> 51 Cal.4th at p. 63 ["Expert opinion that particular criminal conduct
> benefited a gang by enhancing its reputation for viciousness can be sufficient
> to raise the inference that the conduct was 'committed for the benefit of . . . a
> [ ] criminal street gang.' "].)  Similarly, by bragging about the crime, the
> hypothetical perpetrator would enhance his reputation within the gang by
> demonstrating he is "willing to commit violent acts on behalf of the gang."
> (Italics added.)  These opinions are supported by substantial evidence that
> defendant announced his gang affiliation during the crime and then boasted
> about the crime to fellow gang members.
>
> First, the record supports the predicate underlying Detective
> Creighton's opinion that defendant announced his VSM membership during
> the crime.  J.A. testified that when defendant pulled out the gun and
> demanded the car, defendant said, "Do you know where you are?  This is my
> hood," which J.A. construed as a threat based on his being in "the wrong
> part of town."  As they drove off together, defendant said, "I'm from San
> Marcos," which J.A. construed as defendant "represent[ing]" San Marcos or
> claiming it as his "hood."  Defendant vehemently argues this reference to
> "San Marcos" was too vague to constitute a reference to the Varrio San
> Marcos gang.  We disagree.  As Detective Creighton explained, the
> reference to "San Marcos" was a reference to the gang:
>
>> "Q. And this 'Where are you from?'  Is there some particular
>> significance to that as a question in a gang context?"
>>
>> "A. As alluded to, it's essentially a challenge.  It's an
>> opportunity for a gang member to claim their gang in the face
>> of another gang member or a group of gang members to either
>> demonstrate their allegiance to that gang or to determine if

21

they're not willing to say where they're from, if they are indeed a gang member. [¶]  So it's essentially a challenge."

"Q. Okay. And how about when it's not used as a question but rather when it's used as a statement of, 'I am from' – and a location is said? [¶]  Does that have a meaning when it comes from a gang member?"

"A. Yes it does."

"Q. And so, for example, 'I am from San Marcos.'  Is that just saying geographically I have a San Marcos address?"

"A. No."

"Q. What's it mean?"

"A. It means he or she is claiming to be a San Marcos gang member."

"Q. Okay."

"A. *Which would associate with Varrio San Marcos."* (Italics added.)

Our review of the reporter's transcript indicates numerous other instances during trial when counsel, a witness, or the court referred to the Varrio San Marcos gang simply as "San Marcos."  Substantial evidence shows defendant announced his gang affiliation during the commission of the kidnapping during a carjacking, which distinguishes this case from two of the authorities on which defendant relies.  (See *People v. Albarran* (2007) 149 Cal.App.4th 214, 227 ["this shooting presented no signs of gang members' efforts in that regard – there was no evidence the shooters announced their presence or purpose – before, during or after the shooting."]; *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1363 ["nothing in the record indicates that appellant or his companions did anything while in the supermarket to identify themselves with any gang, other than wearing clothing with red on it.  *No gang signs or words were used*, and there was no evidence that . . . any of the . . . persons who witnessed the crime knew that gang members or affiliates were involved"], italics added.)

/ / /

Second, substantial evidence shows that defendant recounted his near-miss with law enforcement to fellow VSM members, and sent a text message to a VSM associate the next day declaring himself "the baddest nigga from the set." Although defendant asserts these communications do not necessarily constitute boasting, they strongly support the permissible inference that defendant conveyed to his fellow gang members or associates that he had committed an offense worthy of being pursued by a law enforcement helicopter (the "bird" or "ghetto bird"), that he successfully evaded capture, and this is what made him "the baddest" member of VSM. [FN 8 omitted].

Defendant's reliance on cases involving improper, conclusory expert opinions is misplaced. (See *People v. Ochoa* (2009) 179 Cal.App.4th 650; *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*).) In *Ochoa*, the appellate court reversed the gang enhancement attendant to a carjacking conviction because the gang expert's opinion that carjacking by a gang member would always be for the benefit of the gang ""did nothing more than [improperly] inform the jury how [the expert] believed the case should be decided,"' without any underlying factual basis to support it." (*Ochoa*, at p. 662.) As noted, Detective Creighton acknowledged that not every kidnapping during a carjacking committed by a gang member will be gang-related; rather, it is the announcement of gang affiliation during the commission of the offense that benefits the gang by promoting its notoriety and deterring cooperation with law enforcement. That element was missing in *Ochoa*; it is present here.

Similarly, in *Ramon*, the appellate court reversed the gang enhancement because the gang expert's opinion regarding the defendant's intent to benefit his gang was based on the fact that he and a fellow gang member were apprehended together in gang territory in possession of a stolen vehicle and firearm. (*Ramon*, *supra*, 175 Cal.App.4th at pp. 846-848.) Detective Creighton's opinion was not so limited.

In sum, substantial evidence supports the jury's true finding on the gang enhancement allegation.

(Lodgment No. 1, ECF No. 12-1 at 20-27.)

The Due Process Clause of the Constitution guarantees defendants the right to be convicted only upon proof of every element of a crime beyond a reasonable doubt. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (citing *In re Winship*, 397 U.S. 358, 364

(1970)).  On federal habeas corpus review of a conviction on sufficiency of evidence grounds, however, a petitioner "faces a heavy burden" to establish a due process violation.  *Id.*  The Ninth Circuit has described a petitioner's burden as follows:

> First, he must meet the burden under *Jackson v. Virginia* of showing that "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. 307, 319 [citations omitted] (1979) (Stevens, J., concurring) (emphasis in original).  Second, after the passage of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), the standards of *Jackson* are applied "with an additional layer of deference," requiring the federal court to determine "whether the decision of the [state court] reflected an 'unreasonable application of' *Jackson* . . . to the facts of this case."  *Juan H.*, 408 F.3d at 1274–75; *see also Bruce v. Terhune*, 376 F.3d 950, 960 (9th Cir. 2004) (O'Scannlain, J., concurring).

*Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018).

While circumstantial evidence can be sufficient to support a conviction, "[s]peculation and conjecture cannot take the place of reasonable inferences and evidence . . . ."  *Id.* at 1218; *Juan H.*, 408 F.3d at 1279; *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 2000) ("mere suspicion or speculation cannot be the basis for logical inferences").  A federal habeas court must "mindful of 'the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review.'"  *Juan H.*, 408 F.3d at 1274 (quoting *Wright v. West*, 505 U.S. 277, 296-97 (1992)).  Deference under AEDPA, however, "does not imply abandonment or abdication of judicial review."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  In determining whether sufficient evidence has been presented, the Court refers to the elements of the crime as defined by state law.  *See Jackson*, 443 U.S. at 324, n.16; *Juan H.*, 408 F.3d at 1276.

/ / /

/ / /

/ / /

18cv2368 CAB (LL)

California courts have described the prosecution's burden to establish a California Penal Code § 186.22(b)(1) enhancement as follows:

> There are two "prongs" to the gang enhancement under section 186.22, subdivision (b)(1). (*People v. Albillar* (2010) 51 Cal.4th 47, 59, 119 Cal.Rptr.3d 415, 244 P.3d 1062 (*Albillar*).) The first prong requires that the prosecution prove the underlying felony was "gang related." (*Id*. at p. 60, 119 Cal.Rptr.3d 415, 244 P.3d 1062; *People v. Gardeley* (1996) 14 Cal.4th 605, 622, 59 Cal.Rptr.2d 356, 927 P.2d 713.) The second prong "requires that a defendant commit the gang-related felony 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' "[FN 10 omitted] (*Albillar*, at p. 64, 119 Cal.Rptr.3d 415, 244 P.3d 1062; § 186.22, subd. (b)(1).)
>
> Section 186.22, subdivision (b)(1) provides three alternatives for establishing the first prong – that the underlying offense was "gang related." The offense may be committed (1) for the benefit of a gang; (2) at the direction of a gang; or (3) in association with a gang. (See *Albillar*, *supra*, 51 Cal.4th at pp. 59-60, 119 Cal.Rptr.3d 415, 244 P.3d 1062.) Because the first prong is worded in the disjunctive, a gang enhancement may be imposed without evidence of any benefit to the gang so long as the crime was committed in association with or at the direction of another gang member. (*People v. Leon* (2008) 161 Cal.App.4th 149, 162, 73 Cal.Rptr.3d 786; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198, 5 Cal.Rptr.3d 615.) The first prong therefore may be established with substantial evidence that two or more gang members committed the crime together, unless there is evidence that they were "on a frolic and detour unrelated to the gang." (*People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198, 5 Cal.Rptr.3d 615; see also *Albillar*, *supra*, 51 Cal.4th at pp. 61–62, 119 Cal.Rptr.3d 415, 244 P.3d 1062.)

*People v. Weddington*, 246 Cal. App. 4th 468, 484 (2016).

Detective Creighton, a gang detective for the San Diego Sheriff's Department who testified as an expert, said there are two main rival gangs who operate in the San Marcos area, Varrio San Marcos and South Los. (Lodgment No. 8 vol. 3, ECF No. 12-10 at 152, 154.) Ramirez is a member of Varrio San Marcos or "VSM." (*Id*. at 182.) Gang members have a "common sign" to represent VSM which is either to make the letters "SM" or the numbers associated with those letters (19 for S, 13 for M) with their hands.

(*Id.* at 153.)  According to Creighton, when a gang member says they are "from" somewhere, it is not simply an identification of where they are from geographically but also what gang they are associated with.  (*Id.* at 159.)  For example, if a gang member says, "I am from San Marcos," they are claiming to be a VSM gang member and they intend to communicate that fact to whomever they are speaking to.  (*Id.*)  Visible tattoos associated with a gang are another way a gang member publicly "claims" a gang.  (*Id.* at 160-61.)  In order to raise their status and profile in a gang, gang members will commit crimes and will hold weapons for other gang members.  (*Id.* at 164.)  Gang members are also expected to commit crimes for the benefit of the gang and a gang member's status is raised depending on the seriousness of the crime committed.  (*Id.* at 166-67.)  Gang members are only permitted to display tattoos in visible places if they are sufficiently high up in the hierarchy of the gang.  (*Id.* at 169-70.)  The concept of "respect" is very important to gang members.  (*Id.* at 178.)  If a victim does not display sufficient respect the gang member will increase his or her aggression until the victim displays sufficient fear, which is synonymous with respect.  (*Id.* at 178-79.)

Creighton's testimony then shifted to the facts of Ramirez's case.  Creighton testified that the transit center where J.A. was initially carjacked was near the territory claimed by a gang called Vista Home Boys or "VHB."  (*Id.* at 189.)  Ramirez's presence in or near VHB territory would be dangerous for Ramirez and he would likely want to get out of the area any way he could.  (*Id.* at 189-90.)  Ramirez would also be likely to carry a gun with him in rival territory.  (*Id.* at 188-89.)  The prosecutor then asked Creighton to consider a hypothetical: a VSM gang member forces a person at gunpoint to give him a ride then forces the victim out of car, would the carjacking be gang-related?  (Lodgment No. 8 vol. 4, ECF No. 12-11 at 16.)  Creighton responded that without other facts it would not.  (*Id.*)  However, if the individual who committed the carjacking told the victim that he was "from San Marcos," in Creighton's opinion the crime was benefit the gang because the perpetrator would be "promoting his gang membership as a deterrent for the victim to either report the crime or be concerned about reporting the crime . . . ."

1    (*Id.* at 16-17.)  If the perpetrator of the carjacking also displayed visible gang tattoos, that
2    would be more evidence that the crime was committed for the benefit of the gang because
3    it would further instill fear in the victim and promote the gang's reputation in the
4    community.  (*Id.* at 17-19.)  Creighton was also to asked to consider these additional
5    facts: the carjacking perpetrator texted another gang member to ask for a ride after
6    escaping police during a high speed chase and texted a high level VSM member and
7    referred to himself as "the baddest n-gga in the set."  (*Id.* at 18-23.)  In Creighton's
8    opinion, these additional facts supported a conclusion that the carjacking and kidnapping
9    were committed for the benefit of the gang because it increased the visibility and fear of
10   VSM.  (*Id.* at 22-24.)

11        This evidence was sufficient for "*any* rational trier of fact [to] have found the
12   essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443
13   U.S. 307, 319 (1979).  Creighton's expert testimony established that when Ramirez
14   identified himself as "from San Marcos" and had prominent and visible San Marcos
15   tattoo, his goal was to intimidate and create fear of the gang as well as increase its
16   reputation in the community for committing crimes.  This was sufficient to establish the
17   "underlying felony offense" was committed for the benefit of a gang.  *Weddington*, 246
18   Cal. App. 4th at 484.  It was also sufficient for any rational trier of fact to find that
19   Ramirez committed the kidnapping during a carjacking "with the specific intent to
20   promote, further, or assist in any criminal conduct by gang members."  *Id.*  Ramirez's
21   self-identification to J.A. as a VSM gang member as well as the text messages he sent
22   after the carjacking establish that he intended to promote fear of VSM and further its
23   reputation by committing the crime.

24        The state court's denial of this claim was neither contrary to, nor an unreasonable
25   application of, clearly established Supreme Court law.  *Bell*, 535 U.S. at 694.  Nor was it
26   based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  Ramirez is
27   not entitled to relief as to this claim.
28   / / /

18cv2368 CAB (LL)

## V.  **CONCLUSION**

After considering the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the lodgments and other documents filed in this case, as well as the legal arguments presented by both parties, and for all the foregoing reasons, the petition is **DENIED**.

Rule 11 of the Rules Following 28 U.S.C. § 2254 require the District Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254 (West 2019).  A COA will issue when the petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253 (West 2019) ; *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).  A "substantial showing" requires a demonstration that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'"  *Beaty v. Stewart*, 303 F.3d 975, 984 (9th  Cir. 2002) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Here, the Court concludes Ramirez has not made the required showing, and therefore a certificate of appealability is **DENIED**.

**IT IS SO ORDERED.**

Dated:  August 30, 2019

_____
Hon. Cathy Ann Bencivengo
United States District Judge

18cv2368 CAB (LL)